UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

v.

DYANN CAROLYN GARDNER, a/k/a
Diane C. Gardner,
　　　　　　*Defendant-Appellant.*

No. 03-4018

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Henry E. Hudson, District Judge.
(CR-02-138)

Argued: April 1, 2003

Decided: August 14, 2003

Before TRAXLER and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Amy Leigh Austin, Assistant Federal Public Defender,
Richmond, Virginia, for Appellant. Nicholas Stephan Altimari, Assis-
tant United States Attorney, Richmond, Virginia, for Appellee. **ON
BRIEF:** Frank W. Dunham, Jr., Federal Public Defender, Frances H.
Pratt, Research and Writing Attorney, Richmond, Virginia, for Appel-
lant. Paul J. McNulty, United States Attorney, Richmond, Virginia,
for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

Dyann Carolyn Gardner, a recipient of Supplemental Security Income ("SSI") payments, was convicted of various charges, all stemming from Gardner's repeated failure to inform the Social Security Administration ("SSA") of certain facts relevant to her SSI eligibility. Gardner appeals, and we affirm.

I.

In general terms, SSI payments are available to aged, blind, or disabled individuals whose income and assets fall below a certain threshold. If the SSI applicant is married and living with a spouse who is not eligible for SSI benefits, the income of the spouse is considered when determining whether the applicant is eligible for SSI benefits. If the resident spouse's income exceeds a specified amount, the otherwise eligible spouse is not entitled to any benefits. *See* 42 U.S.C.A. § 1382(a) (West Supp. 2003); 20 C.F.R. § 416.1160 (2003).

Gardner unsuccessfully applied for SSI benefits in 1991, leaving blank the sections in the application asking for information about a spouse. In April 1993, Gardner successfully reapplied, this time noting that she was married to (but had for years been estranged from) Bobby Gardner. The 1993 application informed Gardner that she "must tell Social Security every time there is a change." J.A. 231. The application listed the types of changes that must be reported, including changes in marital status (described as marriage, divorce, separation, or the resumption of co-habitation after a separation) and changes in "things of value that you own"—for example, when "[y]ou buy or are given anything of value." J.A. 232.

In May 1993, Gardner and Clarence Bagby bought a house (the "Glenview Road house") financed through the Department of Veter-

an's Affairs. The Deed of Trust indicated that Gardner was Bagby's wife. However, Gardner and Bagby were not formally married until June 1994. Gardner did not inform the SSA of either the marriage or the purchase of the Glenview Road house, and she continued to receive SSI payments.

In the fall of 1996, an employee of the North Carolina Department of Social Services notified the SSA of Gardner's marriage and home ownership. The SSA sent Gardner a letter asking her to come to the office for a review of "all sources of income, living arrangements and any changes in your circumstances." J.A. 233. Because Gardner did not respond to that letter, the SSA sent a "Notice of Planned Action," which stated that Gardner's SSI payments would be stopped as of January 1, 1997, unless Gardner took certain steps to continue the benefits. J.A. 234.

On January 23, 1997, Gardner went to an SSA office where she completed a "Statement for Determining Continuing Eligibility for Supplemental Security Income Payments," J.A. 237, a document referred to by the SSA as a "redet." In the redet, Gardner denied that there had been any change in her marital status and denied owning a home. Instead, she stated that she rented a home for $300 per month, listing Clarence Bagby as her landlord. Gardner specifically told the SSA that she was still married to but separated from Bobby Gardner. She claimed that a niece who was angry at her had lied to the Department of Social Services. Based on this information, Gardner's SSI payments were continued, but in a reduced amount, because the redet revealed that Gardner had more money in the bank than allowed by SSI regulations.

Gardner thereafter filed a request for reconsideration of the reduction in her SSI payments. At this time she sent the SSA a copy of the certificate showing that she married Clarence Bagby in 1994, along with one of Bagby's pay stubs. During a telephone conversation with an SSA employee on July 1, 1997, however, Gardner stated that she had no recollection of her marriage to Bagby. She explained that Bagby had not really lived at the Glenview Road house since she moved in, but that he came by the house occasionally to pick up clothes or mail. The SSA accepted Gardner's statements. Because Bagby did not live with Gardner, the SSA did not consider his income

when determining Gardner's eligibility. Gardner's SSI payments, therefore, were not reduced.

On July 5, 1997, Gardner visited an SSA office and filled out another redet. In this redet, she acknowledged that she was married to Bagby, but she again stated that she did not recall the marriage. She stated that Bagby owned the Glenview Road house but did not live there, and that she was unable to contribute any money towards the household expenses.

In September 1997, the SSA again had contact with Gardner and learned for the first time that Gardner had an ownership interest in the Glenview Road house. Because Bagby was paying the household expenses, Gardner was charged with "income support and maintenance," J.A. 52, which reduced the amount of Gardner's SSI payments.

In June 2001, Gardner filled out yet another redet. This time she listed Bagby as a member of her household and stated that he had moved into the house in June 1994. In response to a question about whether Gardner "or your spouse living with you" owned the house where Gardner lived, Gardner answered yes. J.A. 268. In the "remarks" section, however, Gardner stated that Bagby owned the house, but that he lived in Middlesex County and only occasionally spent the night in the Glenview Road house.

By January 2002, the SSA had concluded that Bagby had lived with Gardner since their marriage, which required Bagby's income to be considered when determining Gardner's SSI eligibility. The SSA determined that, with the exception of a few months during the marriage when Gardner would have qualified for some "very small amounts," J.A. 54, Bagby's income rendered Gardner ineligible for any SSI payments. The government calculated that it had paid Gardner more than $29,000 in SSI benefits to which she was not entitled.[1]

---

[1]Gardner insists that the SSA was calculating her benefits properly from February 1997 through July 1998, because she received a smaller payment during that period by virtue of the support she was receiving from Bagby. We disagree. The evidence presented at trial showed that

During the course of the government's investigation of the matter, SSA special agents questioned Gardner and took a sworn statement from her. In that statement Gardner admitted that she married Clarence Bagby in 1994 and that she and Bagby bought the Glenview Road house before they were married. Gardner stated that Bagby had lived in the house with her since they bought it, "except for a few occasions when he spends the night at other places." J.A. 298. Gardner acknowledged that she did not list Bagby as a member of her household on SSA forms. Gardner explained that she

> lied to the Social Security Administration because I don't feel like my marriage is very good and Clarence Bagby does not give me any money. . . . I am sorry for making false statements to the SSA over the years by telling them Clarence Bagby did not live with me. However, I felt I had no choice because of my personal and financial situation. I am sorry for what I have done. But I don't feel like I am married [or] feel like I have a man.

J.A. 299-301.

The grand jury returned a five-count indictment against Gardner, with all charges stemming from Gardner's repeated failures to inform the SSA of the fact that she had bought a house and was married to

---

Gardner's SSI benefits were reduced during this period because the SSA believed that Gardner was receiving help with her bills from a non-resident spouse. *See Gordon v. Shalala*, 55 F.3d 101, 102 (2nd Cir. 1995) ("An SSI recipient is paid a flat monthly benefit rate, but the benefits are reduced by the amount of non-excludable income received by the individual. Such income is anything that the SSI recipient receives in cash or in kind that can be used to meet his or her needs for food, clothing and shelter . . . ." (citations omitted)). The government's witnesses made it clear that if they had known that Bagby had in fact lived with Gardner since the marriage, Bagby's income would have been attributed to Gardner and Gardner would have been ineligible for *any* benefits for all but a few scattered months during the marriage. Thus, Gardner's assertion that she was receiving the proper amount of SSI benefits from February 1997 through July 1998 is simply not supported by the evidence.

and living with Bagby. A bench trial was held, and the district court found Gardner guilty of all charges. This appeal followed.

II.

Gardner first contends that the government failed to present sufficient evidence to support her convictions. "In evaluating the sufficiency of the evidence, the . . . verdict must be upheld if there exists substantial evidence, including circumstantial and direct evidence, to support the verdict, viewing the evidence in the light most favorable to the government." *United States v. Stewart*, 256 F.3d 231, 249 (4th Cir. 2001), *cert. denied*, 534 U.S. 1049 (2001), and *cert. denied*, 535 U.S. 977 (2002). "Credibility determinations are within the sole province of the [fact-finder] and are not susceptible to judicial review." *United States v. Lowe*, 65 F.3d 1137, 1142 (4th Cir. 1995).

(A)

Count one of the indictment alleged that from June 1994 through June 2001, Gardner knowingly embezzled, stole, or converted money belonging to the United States government. *See* 18 U.S.C.A. § 641 (West 2000). Gardner contends that the government at trial argued only that Gardner stole government benefits, thus limiting this charge to one of larceny, and that the government failed to prove asportation, a necessary element of common-law larceny.

We do not agree with Gardner's assertion that the government limited the section 641 charge to a theory of larceny only, and the government was therefore free to establish that Gardner's actions amounted to conversion of SSI benefits to which she was not entitled. The evidence presented at trial established that Gardner knew she was obliged to report to SSA that she was married to and living with Bagby and that she knew that if she told the SSA the truth, her benefits would be reduced or eliminated. The evidence also established that the government paid Gardner more than $29,000 in benefits to which she was not entitled, and Gardner's statement to the SSA investigator establishes that she received and used the SSI benefits. This evidence is sufficient to support the government's claim that Gardner converted money rightfully belonging to the government. *See United States v. Gill*, 193 F.3d 802, 804 n.1 (4th Cir. 1999) ("18 U.S.C. § 641

only requires the government to show that a thing of value of the United States has been *knowingly received, concealed or retained* by the accused with improper intent." (internal quotation marks omitted)).

Moreover, even if, as Gardner argues, the government at trial limited the section 641 charge to larceny, we would find no error. Gardner told the SSA investigators that she did not tell the SSA about her marriage because she "couldn't afford to lose [her] SSI benefits." J.A. 300. From this statement the district court could reasonably infer that Gardner in fact received and used the SSI benefits, which is enough to satisfy any requirement that the government prove asportation. *See Rainwater v. United States*, 443 F.2d 339, 340 (5th Cir. 1971) (per curiam) ("All that is required to consummate the federal offense of theft [under section 641] is the asportation of property belonging to the United States with the intention of converting it to one's own use. Any appreciable change of the location of the property with felonious intent . . . constitutes asportation."); *United States v. Brown*, 285 F.2d 528, 528 (4th Cir. 1961) (suggesting that asportation is an element of a charge of theft of government property). *But see Morissette v. United States*, 342 U.S. 246, 268 n.28 (1952) ("The history of § 641 demonstrates that it was to apply to acts which constituted larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions.").

(B)

Counts two and three of the indictment alleged that Gardner made false statements to the SSA. *See* 18 U.S.C.A. § 1001(a)(2) (West 2000) (prohibiting the making of "any materially false, fictitious, or fraudulent statement or representation" with regard to "any matter within the jurisdiction of the . . . Government of the United States"). Count four alleged that from June 1994 through June 2001, Gardner knowingly made false statements and representations of fact material in determining Social Security benefits. *See* 42 U.S.C.A. § 1383a(a)(2) (West Supp. 2003). As to all three of these charges, Gardner contends that the government failed to present evidence showing that Gardner knowingly made false statements and failed to present evidence of the materiality of the false statements.

Gardner argues that because she did not believe her marriage was a normal one, the government failed to prove that she knew the statements she made to the SSA were false. We disagree. The evidence at trial made it clear that the marriage between Gardner and Bagby was hardly the stuff of romance novels, and counsel for Gardner was certainly free to argue to the trial court that Gardner did not really believe she was married and therefore that she did not knowingly make false statements. Nonetheless, there is ample evidence in the record from which the district court could reasonably have concluded that Gardner in fact knowingly made false statements—most notably, the statement in which Gardner admitted making false statements to the SSA so that she could keep her SSI benefits. This argument, therefore, is unavailing. *See United States v. Garcia*, 868 F.2d 114, 116 (4th Cir. 1989) ("Even if the evidence can support varying reasonable interpretations, the [fact-finder] is entitled to choose among them." (internal quotation marks omitted)).

As to materiality, Gardner contends that because the SSA knew (through the information provided to it by the state Department of Social Services) before July 1997 that Gardner was married and that she was co-owner of the Glenview Road home, the false statements could not have been material. This argument is without merit.

Preliminarily, we point out that the critical issue for SSI purposes was whether Gardner and Bagby lived in the same household. Thus, even if the SSA knew from other sources that Gardner and Bagby were married, it did not know whether Bagby lived with Gardner, a fact Gardner repeatedly denied. But more importantly, the fact that SSA had some information from other sources cannot somehow render the critical information immaterial. *See United States v. Ismail*, 97 F.3d 50, 60 (4th Cir. 1996) ("A fact about a matter within an agency's jurisdiction is material under § 1001 if it has a natural tendency to influence agency action or is capable of influencing agency action." (internal quotation marks omitted)).[2] The government's witnesses tes-

---

[2]At best, the government's possession of information from other sources might be relevant as to whether the government reasonably relied on the information provided by Gardner. However, reliance by the government, reasonable or not, simply is not an element of a section 1001

tified that the presence of a spouse in the home was the critical issue for purposes of SSI eligibility, and Gardner repeatedly gave false information on that point. Thus, there was ample evidence from which the district court could reasonably have concluded that Gardner's misrepresentations involved material facts.

(C)

Count five alleged that between June 1994 and June 2001, Gardner had knowledge of an event—her marriage to Bagby—that affected her continuing right to SSI benefits and that she knowingly, and with the intent to defraud, concealed and failed to disclose that event to the SSA. *See* 42 U.S.C.A. § 1383a(a)(3) (West Supp. 2003). Gardner contends that the government failed to prove that Gardner concealed this fact during the entire period alleged in the indictment, given that Gardner herself in 1997 provided the SSA with a copy of her marriage certificate. While Gardner did give the marriage certificate to the SSA in 1997, she continued to assert that Bagby did not live with her, and it was that fact that was critical to the determination of Gardner's SSI eligibility. This argument, therefore, is unavailing.

Gardner also argues that the government failed to prove that she had actual knowledge of her obligation to disclose the marriage. The SSI applications and "redets" completed by Gardner all made plain Gardner's obligation to report changes in her marital and living status, and the district court could reasonably determine from this evidence that Gardner had knowledge of the reporting obligation.

Accordingly, we reject Gardner's various challenges to the sufficiency of the evidence supporting her convictions.

---

charge. *See Ismail*, 97 F.3d at 60 ("There is no requirement that the false statement actually influence or [a]ffect the decision making process of a department of the United States government." (internal quotation marks and alterations omitted)); *United States v. Brown*, 763 F.2d 984, 993 (8th Cir. 1985) ("Materiality does not require actual reliance by the government on the statement.").

### III.

Finally, Gardner contends that her rights under the Double Jeopardy Clause were violated when she was convicted on count four, which was premised upon misrepresentations occurring between June 1994 and June 2001, along with counts two and three, which were premised upon specific misrepresentations occurring during the period covered by the allegations of count four. Gardner argues that the violations of 18 U.S.C.A. § 1001 alleged in counts two and three must be viewed as lesser-included offenses of the violation of 42 U.S.C.A. § 1383a charge alleged in count four. Thus, Gardner contends that she could be convicted either of count four, but not counts two and three, or counts two and three, but not count four. Because Gardner raised this issue for the first time on appeal, the issue is subject to plain error review.

We will assume that the offenses set forth in 18 U.S.C.A. § 1001 and 42 U.S.C.A. § 1383a are the same offense for double jeopardy purposes. *See, e.g.*, *United States v. Dixon*, 509 U.S. 688, 696 (1993) ("In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies. The same-elements test . . . inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution."). That assumption, however, does not resolve the issue before us, because the Double Jeopardy Clause does not prohibit the government from convicting and sentencing a defendant on multiple counts of the same offense if the defendant has committed multiple violations of that offense. *See Missouri v. Hunter*, 459 U.S. 359, 366 (1983) ("With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."); *United States v. Grandison*, 783 F.2d 1152, 1156 (4th Cir. 1986) ("The double jeopardy clause imposes no restraint upon the power of Congress to define the allowable unit of prosecution and punishment where all charges are brought in one suit." (internal quotation marks omitted)).

Gardner does not contend that the Double Jeopardy Clause prevents the government from bringing separate section 1001 charges for statements Gardner made to the SSA on separate occasions, nor does she contend that the government would be barred from bringing separate charges under section 1383a for statements made on separate occasions. *See United States v. Guzman*, 781 F.2d 428, 432 (5th Cir. 1986) (per curiam) ("Where false statements are made in distinct and separate documents requiring different proof as to each statement, the filing of each false document constitutes a crime, and each filing may be alleged in a separate count of the indictment."); *cf. Blockburger v. United States*, 284 U.S. 299, 302 (1932) ("The Narcotic Act does not create the offense of engaging in the business of selling the forbidden drugs, but penalizes any sale made in the absence of either of the qualifying requirements set forth. Each of several successive sales constitutes a distinct offense, however closely they may follow each other. . . . The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately. If the latter, there can be but one penalty." (internal quotation marks and alteration omitted)).

Count two involved statements made by Gardner on July 1, 1997, and count three involved statements Gardner made on July 5, 1997. However, Gardner also made false statements in the "redet" completed on January 23, 1997, which the government contends was the focus of count four of the indictment. Although count four alleged false statements made between June 1994 and June 1997, this disparity at most amounts to a non-material variance between the allegations of the indictment and the proof offered at trial. *See, e.g.*, *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996) ("When the evidence at trial differs from what is alleged in the indictment, then a variance has occurred. Such a variance violates a defendant's rights and requires reversal only if it prejudices him . . . . As long as the proof at trial does not add anything new or constitute a broadening of the charges, then minor discrepancies between the Government's charges and the facts proved at trial generally are permissible."). Under these circumstances, we cannot conclude that there was error, let alone error of the magnitude necessary to warrant correction under plain error review. *See, e.g.*, *United States v. Carr*, 303 F.3d 539, 543 (4th Cir. 2002) ("[A]n appellate court may correct an error not brought to the attention of the trial court if (1) there is an error (2) that is plain

and (3) that affects substantial rights. If all three of these conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." (internal quotation marks and alteration omitted)), *cert. denied*, 123 S. Ct. 929 (2003).

## IV.

Accordingly, for the foregoing reasons, we hereby affirm Gardner's convictions and sentence.

*AFFIRMED*